### UNITED STATES DISTRICT COURT
### DISTRICT OF RHODE ISLAND

```
******************************)
SUSAN MYERS,                  )
            Plaintiff         )
                              )
v.                            )        Civil Action No.: 04-06T
                              )
SOVEREIGN CHARTERS, LLC,      )
            Defendant         )
******************************
```

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES

Now comes the defendant in the above captioned matter, by and through its undersigned attorney, Holbrook & Murphy, and respectfully opposes the plaintiff's Motion to Compel Answers to interrogatories as moot. In further support of its opposition, the defendant states the following.

On or about October 14, 2004, the plaintiff served interrogatories on the defendant. The defendant's answers to interrogatories were due on November 15, 2004. On December 24, 2004, the defendant served its executed Answers to Interrogatories on plaintiff's counsel by facsimile and mail. (Please see Defendant's Answers to Plaintiff's Interrogatories attached as Exhibit A). The defendant respectfully notes that its answers were overdue. In the interest of reciprocity, the defendant notes that the plaintiff was approximately 48 days overdue in providing her answers to the defendant's interrogatories. (Defendant's Interrogatories to the Plaintiff attached as Exhibit B; Plaintiff's Answers to the Defendant's Interrogatories attached as Exhibit C).

WHEREFORE, the defendant respectfully opposes the Plaintiff's Motion to Compel Answers to Interrogatories as moot.

14

Respectfully submitted,
By its attorneys,

Seth S. Holbrook RI Bar # 5677
**HOLBROOK & MURPHY**
150 Federal Street, 12th Floor
Boston, MA  02110
617-428-1151

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon the attorney of
record for each other party by mail (by hand)
on 2 - 27 - 04

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

```
*****************************)
SUSAN MYERS,                 )
            Plaintiff        )
                             )
v.                           )          Civil Action No.: 04-06T
                             )
SOVEREIGN CHARTERS, LLC,     )
            Defendant        )
*****************************
```

## DEFENDANT'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

NOW COMES the Defendant, Sovereign Charters LLC, in the above captioned matter, by and through its undersigned attorneys, Holbrook & Murphy, and respectfully serves its Response to the Plaintiff's Interrogatories as follows:

### GENERAL OBJECTION

The Defendant objects to the interrogatories served by the Plaintiff to the extent they seek discovery of privileged matters or information or materials prepared in anticipation of litigation. By furnishing an answer to any Interrogatory, the Defendant does not waive any of its general or specific objections to that or any other interrogatory.

### ANSWERS

**INTERROGATORY NO. 1:**        Set forth the full name, date of birth, residence address, business address, occupation, title and functional position of the individual answering these interrogatories on behalf of Sovereign Charters LLC.

**ANSWER NO. 1:**

    Name:    Darryl Withrow



Date of Birth:        January 31, 1965

Residence:           1521 Anita Newport Beach, CA

Business Address:    4141 McArthur Boulevard, Newport Beach, California.

Occupation:          Vice President Operations

Title and Functional Position: Authorized Signatory, Sovereign Charters, LLC

**INTERROGATORY NO. 2:**       Please set forth the facts surrounding the incident and injuries complained of, as known to you, stating the following:

        a.      the exact time and date when Ms. Myers was injured;

        b.      where on the tender to Sovereign Ms. Myers was injured;

        c.      what Ms. Myers was doing at the time she was injured; and

        d.      the circumstances surrounding Ms. Myers' injury.

**ANSWER NO. 2:**

(a)(b)  I am informed that the plaintiff alleges she sustained injury on January 15, 2001, between 2:00 p.m. and 3:00 p.m.  I am informed that at this time the plaintiff was seated on the tender's aft bench seat.

(c)     I am informed sitting.

(d)     I am informed that Ms. Myers alleges she was injured when a rogue wave struck the vessel causing her to lift out of her seat.

**INTERROGATORY NO. 3:**       Set forth the name, address, telephone number, and occupation of each person known to Sovereign Charters LLC who has any knowledge concerning any facts relating to the incident mentioned in the complaint or the damages resulting therefrom, and set forth with particularity the subject matter and facts of his/her knowledge and whether he/she has ever given a statement or prepared a report or other writing relative to this claim.

**ANSWER NO. 3:**

I am informed of the following:

With regard to the plaintiff's medical condition, all of her prior and subsequent medical providers may have some knowledge concerning the plaintiff's claims of injury. The details of said providers are already known to the plaintiff. The defendant has not obtained any statements from these medical providers.

The plaintiff has been examined by Dr. Jonas Lieponis. Dr. Lieponis' report has already been forwarded to plaintiff's counsel. I am informed that Dr. Lieponis is scheduled to re-examine the plaintiff in the future and that his report will be forwarded to plaintiff's counsel upon receipt.

Additionally, all of the plaintiff's prior and subsequent employers may have some knowledge with regard to the plaintiff's claims of damages, including but not limited to the plaintiff's ability to work and physical appearance. The details of said employers are already known to the plaintiff. The defendant has not obtained any statements from said employers.

I am informed that Susan Myers, Steve Quentel, Dan Cole, Dawn Ward, Patsy Smith and Drew Robinson may have knowledge relating to facts set forth in the Plaintiff's Complaint. I do not know the addresses of any of these individuals. Neither do I know of their current occupation, although I am informed that Mr. Quentel, Mr. Cole and Ms. Ward are employed aboard vessels in the Charter service. I am informed that Mr. Quentel is currently located in West Palm Beach, Florida. I am informed that Mr. Cole is currently located in Boca Grande, Florida. I am informed that Ms. Ward is currently located in Florida. I do not know where Ms. Smith is currently located. I do not know where Mr. Robinson is currently located.

Susan Myers, Steve Quentel, Dan Cole, Dawn Ward, Patsy Smith and Drew Robinson worked aboard the M/V SOVEREIGN at the time referred to in the Plaintiff's Complaint. Upon

information and belief, all of these individuals were aboard the tender at the time referred to in the

plaintiff's Complaint and their knowledge would be related to their observances. The plaintiff,

Mr. Quentel and Mr. Cole provided the defendant with written statements. Said statements are

attached hereto and further set forth the witnesses' knowledge of facts related to the plaintiff's

alleged incident.

**INTERROGATORY NO. 4:**       Identify each person whom you expect to testify on behalf

of Sovereign Charters LLC at trial, stating for each witness whether that person is a fact or expert

witness, as well as each document or other exhibit, including summaries of evidence, which you

expect to offer, or may offer at trial.

**ANSWER NO. 4:**

I am informed that the defendant reserves the right to call the following witnesses at trial:

1.      All of the plaintiff's prior and subsequent medical providers.

2.      All of the plaintiff's prior and subsequent employers.

3.      Representative of the United States Coast Guard.

4.      Representative of Northrop & Johnson, 1901 Southeast 4th Avenue, Fort

Lauderdale, Florida. (Factual witness). Northrop & Johnson is the purchasing agent for the

vessel and has information related to the purchase of the M/V SOVEREIGN

5.      Representative of Camper & Nicholsons, 801 Seabreeze Blvd., Fort Lauderdale,

Fl. (Factual witness). Camper & Nicholsons is the Charter Management Company for the vessel.

6.      Steve Quentel, Dan Cole, Dawn Ward, Patsy Smith and Drew Robinson. (Factual

and expert witnesses). Please see Answer to Interrogatory Number 3.

7.      Dr. Jonas Lieponis (Expert Witness). Please see Answer to Interrogatory Number

3.

8.    Jennifer Grasso, 1521 Anita, Newport Beach, CA. (Factual).

9.    Cori Hale, 4141 MacArthur Blvd. Newport Beach, CA. (Factual)

10.    Eloisa Labao, 4141 MacArthur Blvd. Newport Beach, CA. (Factual)

11.    Darryl Withrow, MacArthur Blvd. Newport Beach, CA 4141 (Factual)

12.    Representative of yacht manufacturer and tender manufacturer. (Factual/expert).

I am advised by counsel that no decision has been made on what the defendant's trial exhibits will be. The defendant reserves the right to supplement this Answer in accordance with the Federal Rules of Civil Procedure and the Pretrial Order in this case.

**INTERROGATORY NO. 5:**    Is, or was at the time of plaintiff's injury, someone in your employ responsible for preparing reports of injuries sustained by seamen or other persons aboard the Sovereign or its tender, and if so, who?

**ANSWER NO. 5:**

The defendant objects to this interrogatory only to the extent that the term "responsible" is unduly vague and may implicate legal duties. Without waiving the foregoing objection, I am informed that the vessel's captain is the individual who would prepare reports of injury.

**INTERROGATORY NO. 6:**    Was a deck log maintained on the Sovereign and/or its tender at the time of the incident complained of, and if so, please identify the name, address, phone number and job title of each person who was responsible for maintaining the log at the time of incident, together with the name address and phone number of the person who currently has custody and control of such log?

**ANSWER NO. 6:**

I am informed yes. I am informed that at the time referred to in the plaintiff's complaint the vessel's captain, Steve Quentel, was responsible for maintaining the log. The defendant refers

to its Answer to Interrogatory Number 3.  I do not know who currently has custody and control of the log.

**INTERROGATORY NO. 7:**        Was an engine log maintained on the Sovereign and/or its tender at the time of the incident complained of, and if so, who currently has custody and control of such log?

**ANSWER NO. 7:**

I am informed yes.  I am informed that at the time referred to in the plaintiff's complaint the vessel's engineer, Dan Cole, was responsible for maintaining the log.  The defendant refers to its Answer to Interrogatory Number 3.  I do not know who currently has custody and control of the log.

**INTERROGATORY NO. 8:**        If you paid maintenance and cure to Ms. Myers subsequent to this accident, state the dates of each payment; the amounts, in dollars of each payment, which payments were made, the total number of days included, the rate at which payments were made and the reason why any payments were terminated or suspended.

**ANSWER NO. 8:**

Upon information and belief the plaintiff is already in possession of the requested information.  The defendant reserves the right to supplement this answer.

**INTERROGATORY NO. 9:**        List the names and addresses of all persons, corporations, or other entities who have an ownership interest in the Sovereign and/or its tender, providing the date each vessel was acquired, where each vessel was acquired, from whom each vessel was acquired and for how much each vessel was acquired for, as well as the specifications, model number/hull number and serial numbers for each vessel.

**ANSWER NO. 9:**

I am informed the following with regard to the SOVEREIGN:

| | |
|---|---|
| Vessel Owner: | Sovereign Charters, LLC. |
| Date acquired: | September 2000 |
| Acquired in: | Bimini, Bahamas |
| Acquired from: | EMSAP Holdings |
| Purchase price: | $5,026,324.60 |
| Specifications: | 120 foot Broward, 1993 #1028144 |

I am informed the following with regard to the tender:

| | |
|---|---|
| Vessel Owner: | Sovereign Charters, LLC. |
| Date acquired: | On or about November 10, 2000 |
| Acquired in: | Will supplement |
| Acquired from: | Steve Montifiore and Victoria Dinardo Montifiore |
| Purchase price: | $68,825 |
| Specifications: | 26'2" Intrepid, 1998, Hull Identification Number IBW26012J798 |

**INTERROGATORY NO. 10:**    Identify each and every insurance agreement, including but not limited to P&I agreements, including without limitation all "declaration pages" and extent of coverage pages, which may satisfy in whole or in part any judgment the plaintiff may obtain against you in this action, or which may indemnify or reimburse you for any payment made to satisfy any such judgment, setting forth the amounts of liability and/or extensive insurance coverage, the date said policy was in effect and the named insured under said policy.

**ANSWER NO. 10:**

I am informed that the requested insurance information has already been provided to plaintiff's counsel.

**INTERROGATORY NO. 11:**    State the name, address and telephone number of all officers and crew members who were on duty at the time of Ms. Myers' injury, all deck officers and employees who were on board at the time of the aforementioned injury, and all other witnesses of the injury to Ms. Myers known to you or to your agents or attorneys.

**ANSWER NO. 11:**

Please refer to Answer to Interrogatory Number 3.

**INTERROGATORY NO. 12:**    State whether you, or any employee, agent, representative, investigator or insurer of Sovereign Charters LLC obtained a statement or regarding the incident or damages resulting therefrom from Ms. Myers, and/or from any other person, and if so, state the date that each statement or report was given, the name address and occupation of the person to whom and for whom said statement or report was given, as well as the name and address of the person, firm or corporation having possession of said statement or report.

**ANSWER NO. 12:**

Please see Answer to Interrogatory 3. The statements were obtained by Michael Walters of The Walters Nixon Group, Inc., 123 North Union Avenue, Cranford, NJ.

**INTERROGATORY NO. 13:**    State whether any photographs, videotapes or motion picture films were taken on, or within one month before, the date of the incident or at any time since the incident, of the yacht, Sovereign and/or its tender and/or Ms. Myers, and/or the scene of her injury, and if so, please identify same, giving the date or dates of the taking of said photographs, videotapes or motion picture films, and the names and addresses of the person or persons taking same and/or having possession of the same.

**ANSWER NO. 13:**

I am informed that the defendant is not aware of any such photographs, videotapes or motion picture films.

**INTERROGATORY NO. 14:** Please state the details regarding who made the decision to engage in the work being performed by Ms. Myers and the crew at the time of the accident in suit, including the duties of each crew member at the time.

**ANSWER NO. 14:**

I am informed that the vessel' captain, Steve Quentel, in consultation with Mr. Cole and the crew made the referenced decisions. I am informed that the plaintiff volunteered to accompany the crew. At the time of the alleged incident, Captain Quentel had overall command of the vessel. Mr. Cole was piloting the vessel and the remaining crew was available to assist on deck. The crew was generally engaged in surveying the area for suitable diving and anchoring positions.

**INTERROGATORY NO. 15:**     State where the Sovereign and its tender were anchored on the day of the incident described in the complaint, as well as the course followed by the tender from Sovereign to the point of injury and back to Sovereign.

**ANSWER NO. 15:**

Please see the statements of Steven Quentel and Daniel Cole attached hereto.

**INTERROGATORY NO. 16:**     State the name of the person supervising Ms. Myers at the time of the incident or who directed Ms. Myers to perform the work she was doing at said time.

**ANSWER NO. 16:**

I am informed that the Captain had overall command of the vessel and is ultimately responsible for supervision of the crew. I am informed that the plaintiff was seated in the tender at the time referred to in the plaintiff's complaint and that she was not actively performing work at the time of her incident.

**INTERROGATORY NO. 17:**     List the names and addresses of any persons whom Sovereign Charters LLC has consulted and retained who will testify as an expert witness on behalf of Sovereign Charters LLC concerning either the incident mentioned in the complaint and/or the damages resulting therefrom, specifying as to each such expert witness, the following:

      a.     The expert's qualifications in the expert's field of specialization, including

details as to education and experience in the field of the expert's specialty,

including the manner in which the expert acquired experience in such

specialty;

b.    The expert's residence and business address;

c.    The substance of the facts and opinions as to which each such expert is

expected to testify; and

d.    A summary of the grounds of each opinion of each expert, including any

text or other manual upon which the expert relies.

## ANSWER NO. 17:

I am informed that the defendant has retained Dr. Jonas Lieponis to testify as an expert

medical witness. It is anticipated that Dr. Lieponis will testify in conformance with his report

which has already been provided to the plaintiff's attorney.  Additionally, Dr. Lieponis is

scheduled to reexamine the plaintiff and his supplemental report will be forwarded to plaintiff's

counsel on receipt.

I am informed that Steven Quentel and Daniel Cole are factual witnesses as well as expert

witnesses.  It is anticipated that the witnesses will testify in conformity to their statements which

are enclosed herewith.  Additionally, it is anticipated that the witnesses will testify as to the safe

and reasonable operation of the vessel including the speed and course of the tender at the time of

the alleged incident.  The vessel and its operation met or exceeded all applicable customs and

practices in the industry.  The design, manufacture, configuration and use of the vessel, including

the existence and location of "hand holds" were in all respects proper, safe and appropriate.

I am informed that the defendant has retained Mr. David DuBois and Mr. Thomas Farrell

as liability expert witnesses.  The curriculum vitaes of Messrs. DuBois and Farrell are attached

hereto. It is anticipated that the witnesses will testify with regard to the handling and location of the tender at the time of the alleged incident. Specifically, it is anticipated that the witnesses will testify as follows:

At all times material hereto, the vessel and its tender were seaworthy and reasonably fit for their intended purpose. At all material times, the vessel operator and owner exercised reasonable care for the safety and well being of the crew. The vessel and its operation complied with or exceeded all applicable statutes and regulations, including regulations pertaining to the manufacture and use of the tender as well as regulations promulgated by the United States Coast Guard. The vessel and its operation met or exceeded all applicable customs and practices in the industry. The design, manufacture, configuration and use of the vessel, including the existence and location of "hand holds" were in all respects proper, safe and appropriate.

The defendant reserves the right to supplement this answer.

**INTERROGATORY NO. 18:**    Prior and subsequent to the accident, did your company or any other company to your knowledge, made any repairs, additions, alterations, renovations, improvements or do any similar work on the vessel, specifically the tender to the Sovereign, and if so, state:

    a.    the date and place such repairs were performed;

    b.    the names of all persons or companies participating in said work;

    c.    the name of each and every company who ordered or requested the work be done;

    d.    the reason the work was done;

    e.    a description of all repairs, alterations or similar work done.

**ANSWER NO. 18:**

I am informed nothing beyond routine maintenance.

**INTERROGATORY NO. 19:**        Please state the current location of the Sovereign and the

location of its tender upon which Ms. Myers was injured and the current owner(s) of said vessels.

**ANSWER NO. 19:**

I am informed that the SOVEREIGN is currently located in Fort Lauderdale, Florida.  I do

not know the current location of the tender.

**INTERROGATORY NO. 20:**        If you contend that Ms. Myers was at fault in causing her

injuries, state in detail all the facts on which you base your contention.

**ANSWER NO. 20:**

I am informed that the plaintiff was at fault in not disclosing the full extent of her

preexisting medical condition.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY,

SOVEREIGN CHARTERS LLC,

By:
Its:  Authorized Signatory

As to objections,

Seth S. Holbrook RI Bar # 5677
HOLBROOK & MURPHY
150 Federal Street, 12th Floor
Boston, MA  02110
617-428-1151

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon the attorney of
record for each other party by mail (by hand)    AND FACSIMILE
on 12-24-04

My name is Steve Quentel. I worked for Sovereign Charters (or Glidewell) for a total of about 5 ½ years, ending in November 2002. I began working for Sovereign Charters (or Glidewell) as an engineer aboard the 92' yacht VOYAGER, then became captain of the VOYAGER, and then became captain of the 120' yacht SOVEREIGN. Sovereign Charters owned and operated the yacht SOVEREIGN. Aboard the SOVEREIGN I worked full time year-round. I hold a U.S. Coat Guard 200 gross ton master's license, and a 500-ton international license. I've been licensed beginning in 2000.

The SOVEREIGN is a 1993 120' Broward yacht. During the time I worked aboard it, Sovereign Charters operated the SOVEREIGN as a fully-crewed boat for charter. Jim Glidewell, the owner of Sovereign Charters, personally used the boat about 3-4 weeks out of the year, one week at a time 3-4 different times. The rest of the year, except when the boat was undergoing maintenance and repair work at a shipyard, it was on charter or available for charter as a fully-crewed boat. Glidewell (or Sovereign Charters) bought the SOVEREIGN in August or September 2000, and put it in the charter business right away. The yacht had five charters its first winter season from late 2000 to early 2001, then six charters its first summer season from late spring 2001 to early fall 2001. It chartered for $50,000 per week, plus food and fuel.

The SOVEREIGN operated from St. Maarten in the Caribbean Sea from roughly November through March, and from Newport, RI from roughly May through September. Between the summer (Newport) and winter (St. Maarten) seasons the boat would be at Ft. Lauderdale, FL for 4-6 weeks at a time for maintenance and repair work.

The SOVEREIGN had a 30' hard-bottom Intrepid it towed along as a tender. The Intrepid had twin engines. It's a center-console boat. It was also used for fishing and diving expeditions.

_____ STEPHEN QUENTEL            5/12/03
              Signed                                     Dated

Page 1 of 4

I worked full-time as captain aboard the SOVEREIGN in January 2001. At that time Sue Myers worked full-time aboard the boat as executive chef. In mid-January 2001 the SOVEREIGN and its 30' tender were in St. Maarten. The following week Mr. Glidewell planned to use the SOVEREIGN for a week, and planned to dive around the neighboring island of Anguilla, which was only about 2-3 miles away, to the north. There were up-to-date nautical charts for that area aboard the SOVEREIGN, but the charts don't indicate the nature of the bottom around the island, so one day several of the SOVEREIGN crew, including me and Sue Myers, took the 30' Intrepid from St. Maarten to Anguilla to scout the ocean bottom off the island for its suitability for anchoring the SOVEREIGN. The islands are about two miles apart. The relative location of St. Maarten to Anguilla is as shown on the attached nautical chart of the area.

Besides me and Sue Myers, aboard the 30' Intrepid that trip were the SOVEREIGN's deckhand Dan Cole, mate Dawn Ward, and chief stewardess Patsy Smith. It's possible mate John Barbosa was aboard too, but I'm not sure. That morning we surveyed the ocean bottom on the south side of Anguilla. It was a clear, dry day. Winds and seas were ordinary for that area and time of year. Seas weren't rough.

We traveled in a clockwise circle around Anguilla that day, and in the afternoon we checked the ocean bottom on the north side of Anguilla for suitability for anchoring the SOVEREIGN. Winds and seas there were about the same as they'd been in the morning, nothing out of the ordinary.

Dan Cole was operating the Intrepid in the mid-afternoon when it reached the northeast tip of Anguilla, ready to come around the northeast tip and head back toward St. Maarten. Scrub Island is off the east (or northeast) tip of Anguilla. There is about a 200-yard-wide channel between Anguilla and Scrub Island. Waves were breaking off the eastern (or northeastern) side of Scrub Island; there were whitecaps in that area then. It wasn't safe

_____ STEPHEN QUENTEL    5/12/03
                          Signed                              Dated

Page 2 of 4

to take the Intrepid around Scrub Island through those sea conditions. Waves were not so large in the channel between Anguilla and Scrub Island. We watched the seas and timed things so as to pass through the channel between Anguilla and Scrub Island when we'd encounter a minimum of waves. Passing through that channel we had a following sea, coming from our stern. Cole took the Intrepid through that area at about 10 knots, as slow as possible so the passage would be as safe as could be for the Intrepid and those aboard, but just fast enough to maintain steerage. Cole was standing at the helm operating the boat. I was standing next to him, directing him as we went. Sue Myers was sitting on a padded bench seat at the aft part of the boat. Patsy Smith was also sitting on the aft bench seat. I think Dawn Ward was sitting on the bench seat forward of the center console, but she may have been standing just to the side of that bench seat. The stern part of the boat is the most stable part of the boat to ride in.

Just as the Intrepid was emerging from the 200-yard-wide channel, we crossed over about a 5'-6' sea. The Intrepid came part way out of the water, then landed hard. That wave was larger than others we'd encountered. It was a following sea, from the same direction as the others in that area. There was shallow water in the channel itself, with deep water on each end of it, such that waves built through the channel. Cole did an excellent job at the helm of the Intrepid through that area, taking the proper course at the proper speed.

Sue Myers was hurt when the Intrepid landed coming off that large wave. Just after that, when the Intrepid emerged from that break of waves at the end of the channel, seas were relatively calm again. Cole slowed the boat and we tended to Sue, and then we continued straight back to port at St. Maarten. It took about 75 minutes to reach port from the time Sue was hurt.

Sue Myers hurt her neck in this incident. She'd had neck problems before, but her symptoms were much worse after this incident. She went for medical treatment right after

STEPHEN QUENTEL
Signed

5/12/03
Dated

we reached port in St. Maarten. At a sports medicine physician's direction she then went to Ft. Lauderdale for an MRI test, then returned to St. Maarten and attended a course of physical therapy at the same sports medicine physician's office. She resumed working aboard the SOVEREIGN after returning to St. Maarten, and after about two weeks was working full time. Around that time she became the charter manager for the SOVEREIGN, and excelled in that position. During the rest of her time aboard the SOVEREIGN, to the time I left the boat, she seemed to have made a pretty good recovery.

I've read this 3 ½ -page statement and it's true and correct to the best of my knowledge.

_____ STEPHEN QUENTEL    5/12/03
Signed                              Dated

Page 4 of 4



THIS IS ABOUT WHERE
SUE MYERS WAS INJURED -

STEPHEN QUENTEL   5/12/03

My name is Dan Cole. I worked for Sovereign Charters for about two years, ending December 1, 2002. Sovereign Charters owned and operated the yacht SOVEREIGN. I worked full time year-round aboard the SOVEREIGN as engineer. I've worked as a yacht engineer about six years altogether. I also have experience operating yachts, and hold a U.S. Coast Guard 100-ton master's license.

The SOVEREIGN is a 1993 120' Broward yacht. During the time I worked aboard it, Sovereign Charters operated the SOVEREIGN as a fully-crewed boat for charter. Jim Glidewell, the owner of Sovereign Charters, personally used the boat about four weeks out of the year, one week at a time four different times. The rest of the year, except when the boat was undergoing maintenance and repair work at a shipyard, it was on charter or available for charter as a fully-crewed boat. On the average it was on charter about two weeks each month.

The SOVEREIGN operated from St. Maarten in the Caribbean Sea from roughly November through March, and from Newport, RI from roughly May through September. Between the summer (Newport) and winter (St. Maarten) seasons the boat would be at Ft. Lauderdale, FL for 4-6 weeks at a time for maintenance and repair work.

The SOVEREIGN had a 28' hard-bottom Intrepid it towed along as a tender. The Intrepid had twin 150-horsepower Mercury engines. It's a center-console boat.

I worked full-time as engineer aboard the SOVEREIGN in January 2001. At that time Sue Myers worked full-time aboard the boat as chef. In mid-January 2001 the SOVEREIGN and its 28' tender were in St. Maarten. The following week Mr. Glidewell planned to use the SOVEREIGN for a week, and planned to dive around the neighboring island of Anguilla, which was only about 2-3 miles away, to the north. There were up-to-date nautical charts for that area aboard the SOVEREIGN, but the charts don't indicate the nature of the bottom around the island, so one day several of the SOVEREIGN crew, including me and Sue Myers, took the 28' Intrepid from St. Maarten to Anguilla to scout

RECEIVED JUN 0 9 2003

_Dan Cole_
Signed

_6-30-03_
Dated

the ocean bottom off the island for its suitability for anchoring the SOVEREIGN. The islands are about two miles apart. The relative location of St. Maarten to Anguilla is roughly as shown on the attached chart of the area.

Besides me, aboard the 28' Intrepid that trip were the SOVEREIGN's captain, Steve Quentel; a stewardess (who became a mate and may have been mate at that time), Dawn Ward; and chef, Sue Myers. I don't recall if there were others aboard as well. That morning we surveyed the ocean bottom on the south side of Anguilla. The wind was blowing from the east. It was a clear, dry day. Seas were about 2'. In the morning while we checked the ocean bottom on the south side of Anguilla, Steve Quentel operated the Intrepid.

We traveled in a clockwise circle around Anguilla that day, and in the afternoon we checked the ocean bottom on the north side of Anguilla for suitability for anchoring the SOVEREIGN. Dawn Ward operated the Intrepid some then, and then I operated the Intrepid. Winds were still from the east in the afternoon, and seas on the north side of Anguilla were about 2'. There was one area on that side of the island where it's shallow, and waves were a little larger. As we proceeded around the north side of Anguilla we mostly took waves on the port forward quarter of the boat.

I was operating the Intrepid as we made a steady arc turn around the east (or northeast) tip of Anguilla en route back to St. Maarten. Scrub Island is off the east (or northeast) tip of Anguilla. We were about 1 mile off shore as we came around Scrub Island. As we came around Scrub Island into Anguilla Channel we encountered a large area of confused seas, where waves from different directions combined. In that "confused sea" area, waves were about 5', and choppier than we'd experienced up to then. I was standing while operating the boat then. Sue Myers was sitting on a padded bench seat at the aft part of the boat. I think Dawn Ward was at the side rail, or forward of me. I think Steve Quentel was either standing near the helm alongside me, or was toward the aft part of the boat.

I was taking the Intrepid at about 18 knots, or about half-speed for that boat. That was the safest speed to go in the prevailing conditions. It would have been unsafe to go any slower or faster in 5' confused seas. To get back to the SOVEREIGN from the east (or northeast) tip of Anguilla, it wasn't possible to avoid passing through that confused sea area.

There came a time about one minute after we entered the area of confused seas when the Intrepid crossed over a particular wave that jostled us all somewhat. Sue Myers was hurt then, but I was facing forward and didn't see how she was hurt. I'm not sure what direction that particular wave came from, since waves in that area were from different directions. We were proceeding then at the same steady speed, and following the same course we had been. It took about 12-15 minutes at the same steady speed for us to pass all the way through that area of confused seas.

Afterward, we continued on the same path back to the SOVEREIGN at St. Maarten. Sue Myers went for medical treatment after we reached port there. Over the next couple weeks she underwent some medical tests, then resumed working as chef aboard the SOVEREIGN. She continued working aboard the SOVEREIGN until early December 2001.

I've read this 3-page statement and it's true and correct to the best of my knowledge.

_Dan Cole_
Signed

_5-30-03_
Dated

Page 3 of 3



All rights Reserved. Not For Navigation.

My name is Sue Myers. I live at 262 Flax Hill Road, 1st floor, Norwalk, CT 06854. I worked for Glidewell Laboratories (or Sovereign Charters) from December 1999 to mid-December 2001. Among other things, Glidewell (or Sovereign) owns two yachts, one named VOYAGER and one named SOVEREIGN. I began working for Glidewell as a chef aboard the VOYAGER, then in about August or September 2000 I went to work as a chef aboard the SOVEREIGN. For about the last year that I worked for Glidewell I worked full-time, year round. Before that I worked part-time. From about June 2001 to mid-December 2001 I worked full time as yacht manager and chef.

The SOVEREIGN is a 1993 120' Broward yacht. During the time I worked aboard it, Glidewell operated the SOVEREIGN as a fully-crewed charter boat in an effort to make money with it. Glidewell personally used the boat about three weeks out of the year, one week at a time three different times. The rest of the year, except when the boat was undergoing maintenance and repair work at a shipyard, it was on charter or available for charter as a fully-crewed boat. Glidewell had the SOVEREIGN listed for charter through a yacht broker. During the time I worked as both yacht manager and chef, and even before I had the official position of yacht manager, I frequently dealt with the brokers who arranged the charters. Most charters were for one week, but some were for two or three weeks. The charterers typically paid the charter fee plus expenses, and also tipped the SOVEREIGN crew. The SOVEREIGN operated with a crew of eight, including me. The usual weekly charter fee was $50,000.

The SOVEREIGN operated from St. Maarten in the Caribbean Sea from roughly November through March, and from Newport, RI from roughly May through September. Between the summer (Newport) and winter (St. Maarten) seasons the boat would be at Ft. Lauderdale, FL for 4-6 weeks at a time for maintenance and repair work. Except for when the SOVEREIGN was in Ft. Lauderdale, I lived aboard the boat.

The SOVEREIGN had a 28' hard-bottom Intrepid it tows along as a tender. The Intrepid has twin 150-horsepower Mercury engines. It's a center-console boat.

_____
Signed

4.25.02
_____
Dated

RECEIVED
MAY 0 5 2003

I worked full-time as a chef aboard the SOVEREIGN in January 2001. On Monday or Tuesday January 15 or 16, 2001 (the Monday or Tuesday not quite two weeks before Super Bowl Sunday on January 28, 2001) the SOVEREIGN and its 28' tender were in St. Maarten. The following week the owner, Mr. Glidewell, planned to use the SOVEREIGN for a week, and planned to dive around the neighboring island of Anguilla, which was only about 2-3 miles away, to the north. There were up-to-date nautical charts for that area aboard the SOVEREIGN, but the charts don't indicate the nature of the bottom around the island, so that day several of the SOVEREIGN crew, including me, took the 28' Intrepid from St. Maarten to Anguilla to scout the ocean bottom off the island for its suitability for anchoring the SOVEREIGN. The islands are about two miles apart. The relative location of St. Maarten to Anguilla is roughly as sketched below:



Besides me, aboard the 28' Intrepid that trip were the SOVEREIGN's captain, Steve Quentel; two stewardesses, Patsy Smith and Dawn Ward; the engineer, Drew (I don't recall his last name); and deckhand, Danny Cole. Altogether there were six of us aboard the Intrepid. Two other SOVEREIGN crew remained behind with the SOVEREIGN.



| | |
|---|---|
| _____ | 4.25.03 |
| Signed | Dated |

That morning we surveyed the ocean bottom on the south side of Anguilla, which was the leeward side of the island that day. The wind was blowing from the north at about 10-12 knots. It was a clear, dry day. We stopped for lunch on the north side of Anguilla, toward the western end.

After lunch we resumed the trip around Anguilla. We had finished surveying the ocean floor where we wanted to survey it, but decided to take the Intrepid the rest of the way around Anguilla and then back to St. Maarten rather than just turn around and take the shortest path back. During that part of the trip, Danny Cole stood and operated the boat from the center console. Steve Quentel stood to Danny's right, facing forward. Drew stood to Danny's left, facing forward. Patsy Smith and Dawn Ward sat facing forward on a bench seat just forward of the center console (Patsy on the right and Dawn on the left). I sat facing forward at about the center of the bench seat along the aft part of the boat.

There is a reef and shoals off the north side of Anguilla. Danny took the Intrepid north of (or outside of) those. Our easterly path along the north side of Anguilla was more or less parallel to the island. Waves on the north side of Anguilla that afternoon (which was the windward side then) were 4'-6'. The waves all struck the Intrepid broadside on its port beam. Danny took the Intrepid at a steady speed of about 4-5 miles per hour. He couldn't go any slower without risking the waves swamping or breaching the Intrepid, and it would have been unsafe in those sea conditions to go faster. He took the boat on pretty much a straight-line course that was parallel with the shoreline, and which kept the waves on our port beam. In all, it took about 90 minutes to pass around the north side of Anguilla from its western end to its eastern end.

At about 2:30 p.m. when we were at about the halfway point making our way around the north side of Anguilla, a rogue wave from the same direction as all the other waves (from our port beam) struck the Intrepid and caused me to come 4'-5' up in the air off my seat. I'd been holding onto the seat cushion at the time, but that didn't prevent me from going up in the air. I landed hard on my butt on the bench seat, in about the same spot I'd been

_____          4.25.02
              Signed                                           Dated
                        Page 3 of 8

sitting before, and heard and felt a "pop" in my neck. I felt instant neck pain then, too. At the time, Danny was taking the boat at the same speed and direction as before. There wasn't anything he could have done to avoid taking that wave. He wasn't taking the boat too fast or too slow. It was a pure accident that I got hurt from the rogue wave that way. There wasn't anything Danny did wrong in operating the Intrepid that caused me to get hurt. Usually the aft part of the boat where I was sitting is the safest place to be, where the ride is usually smoothest.

The accident took my breath away. It was about 10 minutes before the others aboard realized I'd been hurt. Once they knew, Drew made an ice pack and applied it to my neck. Danny continued taking the Intrepid at the same speed and along the same course around the rest of the north side of Anguilla, and then back to the SOVEREIGN at St. Maarten. It took about 2 ½ hours from the time I was hurt until we reached the SOVEREIGN.

Once back in port at St. Maarten, I went to a walk-in medical center at Palapys. My neck was fixed in an unnatural "S" shape. I was given Demerol and Valium, and the next day went for a neck x-ray on the French side of St. Martin. Three or four days later, on Friday of that week, I went to Ft. Lauderdale, FL and the next day (Saturday) underwent a neck MRI at East Broward Medical Center. I was told that showed I had two flattened discs in my neck at the C5 and C6 levels. Two days later, on Monday, at the suggestion of the medical center staff I saw neurologist David Robbins in Ft. Lauderdale. At Dr. Robbins' direction, two days later, on Wednesday, I underwent a whole-body nerve test to check for any nerve damage. I was told that test didn't show any nerve damage. Dr. Robbins told me I had the option of undergoing surgery, or trying physical therapy and steroids (oral or cortisone shots). I chose to try therapy and steroids.

I went back to St. Maarten and began attending physical therapy there, on the Dutch side of the island. I attended therapy twice a week for about two months. In that time, the SOVEREIGN was in and out of St. Maarten on charters, and I attended therapy when the

_____
Signed

4. 25. 03
_____
Dated

boat was in port. Therapy consisted of manipulation, stretching, and some exercising of my neck muscles. For about the first two weeks after returning to St. Maarten I worked part-time aboard the SOVEREIGN, then worked full time after that. While I was in Ft. Lauderdale for testing the SOVEREIGN hired an assistant chef, and she stayed on full-time to help with the physical part of my work after I returned to the boat.

In about mid-May 2001 the SOVEREIGN was moved to Ft. Lauderdale between the St. Maarten winter season and the Newport, RI summer season. In the shipyard at Ft. Lauderdale the interior of the SOVEREIGN was re-done, at the direction of Mr. Glidewell's girlfriend. Everything was to be finished in time for a July 2, 2001 broker show where the boat would be on display for all the yacht brokers to see (in furtherance of the boat's charter business). Along with other crew I worked a lot of 16-hour days to get the SOVEREIGN ready for that broker show. We finished everything just in time for that show. A week later the SOVEREIGN moved to Newport, where a charter had already been arranged to begin right after the boat arrived there.

From about June 2001 on I was given the additional job of yacht manager as well as chef. We still had an assistant chef working full-time aboard the SOVEREIGN then, too. I had done a lot of yacht manager-type work for the SOVEREIGN before, but didn't officially have that title until then.

The SOVEREIGN began the summer 2001 Newport season with a 3-week charter, and right after that had a 1-week charter out of Boothbay Harbor, Maine. After that Mr. Glidewell used the boat for one week out of Newport, and thereafter the SOVEREIGN operated out of Newport on charters the rest of that season, to early October when the boat was moved to Ft. Lauderdale for some shipyard work before the St. Maarten winter season began.

While in Ft. Lauderdale in October 2001, all the SOVEREIGN crew including me took a 1-week STCW compliance course taught by the Sea School. Beginning in February 2003

_____
Signed

4.15.03
_____
Dated

Page 5 of 8

U.S. law requires charter yacht crew to be trained in the areas covered by that STCW course. We all took that course then so we'd all be in compliance with the law when it became effective. After taking the STCW course, in late October 2001 I went to California to assist the crew on the VOYAGER for a week, then returned to the SOVEREIGN in Ft. Lauderdale.

Around that time I tried oral steroids for seven days for my neck pain. I didn't notice any real improvement in my neck symptoms from that. From the time of the accident to then my neck condition seemed to slowly deteriorate. I always had symptoms, and they seemed to slowly worsen over time. I didn't re-injure my neck in any other accident after the January 2001 Intrepid incident. It just deteriorated on its own.

At the end of October 2001 or beginning of November 2001 the SOVEREIGN was moved to the Caribbean to begin its winter season. It had a November 8, 2001 St. Thomas charter already booked.

On the day before Thanksgiving 2001 I was told the company was eliminating my position as yacht manager. At that time the SOVEREIGN had a chef, the woman who had been hired as an assistant chef soon after I was hurt, and didn't need two. I was offered two weeks of severance pay. I was earning $52,500.00 per year with the SOVEREIGN (which was about $670 per week net), plus tips from charter customers. My last day of work aboard the SOVEREIGN, and for Glidewell, was December 12, 2001.

In mid-December 2001 I went to work as a chef aboard the yacht MERCEDES, owned by Ray Catena. A friend of mine connected with that boat pleaded for me to come work aboard it, and I agreed to. The boat was then operating from St. Barts in the Caribbean. I worked aboard the MERCEDES only about two weeks, and worked about 16 hours a day every day during those two weeks. The work turned out to be more than I could handle with my continuing neck problems. I was in too much pain to continue. I then went to Ft.

_____
Signed

4·25·03
Dated

Lauderdale after leaving the MERCEDES, and stayed there in January and February 2002 without working. I attended some more physical therapy with therapist Paul Ward in Ft. Lauderdale over that span. I attended about one therapy session a week. My neck symptoms didn't improve much.

In March 2002 I moved to Connecticut, and began working as a bartender at the Clam House restaurant in Westport, CT. In May and June 2001 business there increased, and my neck pain increased then, too.

On September 23, 2002 I went to see orthopedist Dr. Gerard Girasole for the first time. He recommended I undergo another neck MRI, and I did. He said that showed the discs that had been flattened earlier had now begun to fuse with the vertebrae. He recommended neck surgery right away, and I underwent surgery by him and neurosurgeon Dr. Abraham Mintz on October 8, 2002. They installed two screws into two cervical vertebrae (one at the C5 and one at the C6 vertebra) and connected a rod between those two screws to preserve the height between the vertebrae. They also installed some sort of spacer plate between the vertebrae, also to preserve the height between the vertebrae.

I was off work six weeks following that surgery, then returned to work at the Clam House at first as a hostess a couple night a week, then as a bartender again in about mid-November 2002. I began post-surgery physical therapy in mid-December 2002 at Dr. Girasole's office, and continue attending therapy now. At first therapy was twice a week; now it's once a week. My current therapy prescription runs through April 2003. I currently work as a bartender at the Clam House about 20-25 hours a week.

I still have pain in my neck, more so with neck motion. Sometimes the pain radiates to both my shoulders. Right now I feel I have about 20% improvement in my neck symptoms from what they were before surgery. Dr. Girasole told me it could be 9-12 months after surgery before I reach a point of maximum medical improvement.

_____          4.25.03
Signed                                      Dated

Page 7 of 8

I have private health insurance with First Health through my employment with Glidewell which has paid most of my accident-related medical expenses to now. I've made several co-payments for which I haven't been reimbursed.

I hurt my neck once before, in 1995 or 1996. At the time I was working managing a bar in Newport, RI. At that time I saw an orthopedist in Newport, Dr. Elie Cohen, and underwent a neck MRI which I was told showed a problem with a disc at the C5-C6 disc level. I had neck pain then similar to what I had after the January 2001 Intrepid incident, but not as severe. Dr. Cohen prescribed some medications which I took, and had me wear a cervical collar, but never prescribed any therapy. After awhile I saw a neurologist in Boston, MA, Dr. Fischer, who examined my neck and said I was not a surgical candidate, but said I should attend physical therapy. Dr. Fischer gave me a therapy prescription and I then attended about six months of therapy for my neck at the Vanderbilt Center in Newport. My neck felt better after therapy, and felt all right all the way until I hurt it in January 2001 in the Intrepid incident.

I've read this 7 ½ -page statement and it's true and correct to the best of my knowledge.

_____
Signed

4. 25 .02
_____
Dated

Page 8 of 8

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

```
****************************)
SUSAN MYERS,                )
              Plaintiff     )
                            )
v.                          )        Civil Action No.: 04-06T
                            )
SOVEREIGN CHARTERS, LLC,    )
              Defendant     )
****************************
```

## INTERROGATORIES PROPOUNDED BY THE DEFENDANT
## TO BE ANSWERED BY THE PLAINTIFF

PLEASE TAKE NOTICE that pursuant to Rule 33 of the Federal Rules of Civil Procedure, that these interrogatories propounded by the Defendant, Sovereign Charters, LLC., to the Plaintiff, Susan Myers, to be answered within thirty (30) days, in writing under oath. These interrogatories are to be deemed continuing in nature; therefore, any information received by said Plaintiffs' subsequent to the service of the answers to these interrogatories, shall be supplied to the Defendant as supplementary answers without delay.

**Instructions:**

1.      Your best estimate must be given whenever exact data cannot be supplied. Any estimated data must be designated as such, and the basis, source or sources, and derivation of each estimate should be set forth separately.

2.      With respect to the answer to each interrogatory, or subpart thereof, state the source of the information given therein with as much particularity as is reasonably possible, including, without limitation, the nature and designation of any document or file that contains any of the information included in such answer. In addition, identify each other person who you know or believe has or may have some or all of the information sought in such interrogatory or subpart thereof.

3.      Information sought by any interrogatory may be furnished by reference to your answer furnished to another interrogatory. However, separate answers should be given in all cases, and interrogatories should not be joined together and accorded a common answer.



4.    These interrogatories require supplemental or amended answers to the extent required by Rule 26(e). These interrogatories shall be deemed to be continuing requests for supplemental answers pursuant to Rule 26(e)(3), so as to require additional answers if the party on whom these interrogatories are served obtains further information between the time answers are served and the time of trial of this action.

**Introduction:**

Information sought by any interrogatory may be furnished by reference to your answer furnished to another interrogatory. However, separate answers should be given in all cases, and interrogatories should not be joined together and accorded a common answer.

These interrogatories require supplemental or amended answers to the extent required by Rule 26(e). These interrogatories shall be deemed to be continuing requests for supplemental answers pursuant to Rule 26(e)(3), so as to require additional answers if the party on whom these interrogatories are served obtains further information between the time answers are served and the time of trial of this action.

Wherever the words "the incident" appear they mean the incident which is the subject matter of this lawsuit.

**Interrogatories:**

1.    Please state your name, present address, date of birth, present employer and your present occupation, business address and social security number.

2.    Please state the exact hour and date your injury occurred and describe the exact location where your injury occurred by giving the distance and direction to at least three fixed objects in the same area.

3.    If you claim that the weather played any part in the happening of your alleged injury, please describe the weather conditions at the time of your injury and for the hour prior to your injury, including but not limited to wind speed and direction, sea state and direction and precipitation.

4.    If you claim that the defendant's vessel was defective, please describe the specific part of the vessel and/or its equipment concerned, when you first noticed said defect and the manner in which the alleged defect caused your injury.

5.    If you claim that any of the defendant's personnel and/or agents and/or fellow employee(s) failed to exercise reasonable care, please describe the name, title or other identification of the personnel concerned and the act or omission of the above described personnel which caused your injury.

6.     If you claim that your injury was caused by an unseaworthy condition of the ship or its equipment, please describe the unseaworthy condition, state when you first noticed this condition, how long it existed prior to your injury and how it caused your injury.

7.     Please describe in complete detail the particular task or action you were performing at the moment of your injury.

8.     Please describe all injuries, symptoms, ailments, and pains whether physical, mental or emotional which were caused or aggravated by the incident.

9.     As to each medical practitioner or facility who has examined or treated you for any of the injuries, symptoms, ailments, or pains described in your previous answer, please state the name, address and specialty of each medical practitioner, the date of each examination or treatment, the physical, mental or emotional condition for which each examination or treatment was performed and the cost of such examination and to whom the bill was submitted.

10.    If you have had any vocational, rehabilitation, psychological, substance abuse, pain management or physical therapy tests, evaluations, examinations, studies or procedures since the incident, please state the nature thereof, the name, address, occupation and specialty of the individual or providing agency performing these studies, evaluations, examinations, tests or procedures and to whom the bills were submitted.

11.    If you are still under the care of any provider, including those providers previously, please state the name and address of each practitioner and the nature of each condition for which care is being rendered.

12.    Please state the name and address of each medical provider who examined or treated you for any mental or physical condition during the ten (10) year period immediately before the date of the incident and describe the conditions or complaints for which the examination or treatment was performed and the date of each examination or treatment performed.

13.    If you claim disability, disfigurement or other residual condition from the incident, please describe the nature, extent and duration of the disability, disfigurement or other residual condition caused by your injury.

14.    If you claim you will sustain any monetary loss or any other expenses or damages as a result of the injuries or disability described in the previous answer, please state the reason why the loss will be incurred, the amount of the loss and the method by which you arrived at the amount of the loss.

15.    List each job or position of employment, including self-employment, held by you for the five years before the incident, the year in which the incident occurred and each subsequent year to the present, stating the name and address of your employer and the date of commencement, date of termination of employment and earnings for each year employed.

16.    If you claim to have lost any time from gainful employment as a result of the incident set forth in your complaint, please state the specific condition which you claim caused the loss of time, the amount of time lost and if you claim any damage as a result of the time lost, the total of such damages claimed and your method of computing such damages.

17.    If you claim that your earning capacity will be impaired in the future as a result of your injury, please state the nature of the condition that will cause the impairment and the manner in which the condition will impair your ability to work.

18.    Please identify by name and present or last known address, those persons whom you believe were witnesses to the incident and/or to the condition which you allege caused your injury, including those persons who were present at the place where the incident occurred either shortly before or shortly after the incident, and specify which will be called to testify at trial and the anticipated testimony of each.

19.    Regarding each expert witness whom you expect to testify at trial, please state the full name and address of all such expert witnesses, the subject matter on which each such expert may be expected to testify, the substance of all facts to which any such expert is expected to testify, the contents of all opinions to which each expert is expected to testify and a summary of the grounds for each opinion to which each such expert is expected to testify.

20.    Please fully identify all exhibits and chalks you intend to utilize at the trial of this matter.

21.    If since the incident you have suffered any injuries or have been involved in any incident where you suffered injuries, please state the date, time and place of the incident; the manner in which the incident happened and; the names and addresses of all other persons involved in the incident.

22.    If you have ever asserted a claim for damages or for compensation of personal injuries, please state the date of injury, the nature of the injury, the amount of damages or compensation received and the names and addresses of each person or organization against whom a claim was made or from whom payments were received.

23.    Please list each and every witness that you our your attorneys will call to testify at the trial of this matter, including name, last known address, telephone number and expected testimony.

SOVEREIGN CHARTERS, LLC
Respectfully submitted,
By its attorney,

Seth S. Holbrook, RI bar # 5677
HOLBROOK & MURPHY
150 Federal Street, 12th Floor
Boston, MA 02110
(617) 428-1151

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above
document was served upon the attorney of
record for each other party by mail (by hand)
on

KNM:jcd 03-216 8/23/04

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

SUSAN MYERS                          :
              Plaintiff,          :
                               :
    v.                                :     C.A. NO. 04-06T
                               :
SOVEREIGN CHARTERS, LLC              :
              Defendants.        :

## **PLAINTIFF'S ANSWERS TO INTERROGATORIES**
## **PROPOUNDED BY THE DEFENDANT**

**Instructions:**

1.      Your best estimate must be given whenever exact data cannot be supplied. Any estimated data must be designated as such, and the basis, source or sources, and derivation of each estimate should be set forth separately.

2.      With respect to the answer to each interrogatory, or subpart thereof, state the source of the information given therein with as much particularity as is reasonably possible, including, without limitation, the nature and designation of any document, or file that contains any of the information included in such answer. In addition, identify each other person who you know or believe has or may have some or all of the information sought in such interrogatory or subpart thereof.

3.      Information sought by any interrogatory may be furnished by reference to your answer furnished to another interrogatory. However, separate answers should be given in all cases, and interrogatories should not be joined together and accorded a common answer.

4.      These interrogatories require supplemental or amended answers to the extent required by Rule 26(e). These interrogatories shall be deemed to be continuing requests for supplemental answers pursuant to Rule 26(e)(3), so as to require additional answers if the party on whom these interrogatories are served obtains further information between the time answers are served and the time of trial of this action.



**Answers:**

1.    **Please state your name, present address, date of birth, present employer and your present occupation, business address and social security number.**

ANSWER:  Susan Caroline Myers; 426 Courtland Avenue, Unit #2, Stamford, CT 06906; d/o/b ▉▉▉; I am the Restaurant Manager for Onyx Bar & Grill, 970 High Ridge Road, Stamford, CT 06831; SSN ▉▉▉.

2.    **Please state the exact hour and date your injury occurred and describe the exact location where your injury occurred by giving the distance and direction to at least three fixed objects in the same area.**

ANSWER:  My injury occurred on January 15, 2001, between 2:00p.m. and 3:00p.m. The incident occurred on the windward side of Anguilla, about one-third the way around the island, heading northeast, in the vicinity past Road Harbor and before Island Harbor and Scrub Island.  Please see the statement and diagram I previously prepared for The Walters Nixon Group on April 25, 2003, a copy of which is attached for your convenience.

3.    **If you claim that the weather played any part in the happening of your alleged injury, please describe the weather conditions at the time of your inquiry and for the hour prior to your injury, including but not limited to wind speed and direction, sea state and direction and precipitation.**

ANSWER:  The weather played a part in my injury.  The accident occurred during the "Christmas Wind" season in that part of the Caribbean weather pattern in that area. Initially, as we departed Road Harbor it was calm.  The sea conditions became visually rough and choppy.  The wind was kicking up, and was approximately 10-12 knots.  We had to travel outside the reef.  The wind was hitting the Intrepid, the *Sovereign's* tender, which was running parallel to the windward side of the island, and waves were confused and were hitting the beam.  After my injury, in the passage between the main island and Scrub Island, the wave action became more pronounced and unpredictable.  There was no precipitation at the time.  The sky was clear.

4.    **If you claim that the defendant's vessel was defective, please describe the specific part of the vessel and/or its equipment concerned, when you first noticed said defect and the manner in which the alleged defect caused your injury.**

ANSWER:  There were no handholds or other devices to prevent crew from being thrown about at the stern on the Intrepid tender.

5.    **If you claim that any of the defendant's personnel and/or agents and/or fellow employee(s) failed to exercise reasonable care, please describe the name, title or other**

**identification of the personnel concerned and the act or omission of the above described personnel which caused your injury.**

ANSWER: Objection. This interrogatory calls for a legal conclusion. However, without waiving said objection, it is my claim that the *Sovereign's* Captain, Stephen Quentel, did not exercise reasonable care while commanding the Intrepid tender. After scouting anchoring and diving grounds and after finishing lunch on Anguilla, the crew of the *Sovereign*, traveling in the *Sovereign's* tender, was required to transit back to St. Martin, where the *Sovereign* was anchored. I asked *Sovereign's* Captain, Stephen Quentel, not to go around the windward side of the island, Anguilla, because the sea conditions were visually rough and choppy. Going back the way we came was both a calmer and shorter route to St. Martin. The seas did not look tenable as we were heading around the windward side of the island. In that part of the Caribbean, the January winds are very forceful, especially on the windward side of Anguilla. Furthermore, there are reefs off shore of the windward side of Anguilla, causing a very confused sea, a condition like a gut tide. In Captain Quentel's response, I was delegated to sit in the back (at the stern). He proceeded to take the tender to the windward side of the island and passed through the narrow channel between Anguilla and Scrub Island.

In addition to Mr. Quentel's negligent handling of the tender, he was not qualified to make responsible decisions in his operation as Captain of *Sovereign*. He did not hold the appropriate license. To captain a vessel such as *Sovereign*, a 200 ton license is needed. Mr. Quentel possessed only a 100 ton license. Mr. Quentel handed over the controls to Danny Cole, and Mr. Cole was driving the Intrepid at the time of the incident. In doing so he was subject to the directions of his Captain, Mr. Quentel.

**6.     If you claim that your injury was caused by an unseaworthy condition of the ship or its equipment, please describe the unseaworthy condition, state when you first noticed this condition, how long it existed prior to your injury and how it caused your injury.**

ANSWER: The Intrepid had no handholds at the stern. I was directed by the Captain to sit in the stern. The rest of the crew were delegated to other locations aboard the vessel. The two stewardesses, Patsy Smith and Dawn Ward, were sitting on the bench at the bow, and Mr. Quentel and Drew were sitting in the middle. In the stern there was nothing to hold on to or restrain me in order to protect myself from the rough seas. The vessel itself was too small and otherwise inadequate to safely navigate the hazards apparent in the route selected by the Captain.

**7.     Please describe in complete detail the particular task or action you were performing at the moment of your injury.**

ANSWER: At the instruction of the owner of *Sovereign*, James Glidewell, the crew was checking depths on the leeward side of Anguilla. Mr. Glidewell was planning on coming down to the islands in approximately two weeks to go diving. In anticipation of Mr. Glidewell's diving plans, the Captain and crew brought the Intrepid over to Anguilla to

mark charts as to the island's depths. I was part of the crew of the *Sovereign* and of the intrepid tender to assist in this task.

After taking depths, the crew stopped for lunch at the western end of the island, where the customs office is, to declare our passports. After lunch, we were to proceed back to St. Martin, albeit a longer route around the windward side of the island. The incident complained of occurred on our trip back to St. Martin. In further response to this interrogatory, please see my answer to Interrogatory No. 5.

**8.    Please describe all injuries, symptoms, ailments, and pains whether physical, mental or emotional which were caused or aggravated by the incident.**

ANSWER:  On advice of counsel, I object to this interrogatory only to the extent to which it calls for the opinions and conclusions of individuals with medical expertise. All injuries, symptoms, ailments, and pains caused by this incident are documented in my medical records previously provided to defendant's insurer. As a layperson, I have suffered three years of chronic pain, have two flattened discs and have endured two back surgeries to fuse my vertebrae. I continue to have back pain. In further response, please see answer to Interrogatory No. 9.

**9.    As to each medical practitioner or facility who has examined or treated you for any of the injuries, symptoms, ailments, or pains described in your previous answer, please state the name, address and specialty of each medical practitioner, the date of each examination or treatment, the physical, mental or emotional condition for which each examination or treatment was performed and the cost of such examination and to whom the bill was submitted.**

ANSWER:

>    1/15/01:            Emergency treatment on St. Martin at walk-in.
>
>    1/16/01:            X-ray on French side of St. Martin.
>
>    1/20/01:            X-rays in Florida.
>
>    Dr. David Robbins, Neurology, Weston, FL 33327
>
>    1/22/01:            Nerve test.
>
>    1/25/01:            EMG studies.

For the next 2 months, I attended physical therapy on the Dutch side of St. Martin.

Paul Wand, M.D., Neurological Pain Management, Inc., 4488 N. University Drive, Lauderhill FL 33351

| | |
|---|---|
| 11/09/01: | Cervical strain with radiculopathy, probably C6-C7 with compression. Lateral carpal tunnel syndrome. |
| 1/25/02: | Office visit |
| 2/22/02: | Office visit |
| 4/16/02: | Office visit |
| 6/25/02: | Office visit |

Gerard Girasole, M.D., The Orthopaedic & Sports Medicine Center, 888 White Plains Road, Trumbull CT 06611

| | |
|---|---|
| 9/06/02: | Evaluation for neck pain, radiating down right arm; ongoing for over 2 years. Consistent pain & numbness & tingling into right arm. |
| 10/21/02: | Follow-up post surgery. |
| 11/18/02: | Office visit |
| 1/29/03: | Office visit |
| 3/28/03: | Office visit |
| 4/23/03 | Office visit |
| 4/30/03: | Office visit |
| 5/28/03: | Evaluation for facet blocks with Dr. Cohen. |
| 7/15/03: | Evaluation for facet joint injections at C7-T1 and T1-2 for diagnostic & therapeutic purposes. |
| 2/13/04: | Pseudoarthrosis at C6-7. Posterior spinal fusion for 3/2/04. |
| 3/1/04: | Office pre-op visit |
| 3/16/04: | Office visit |
| 5/3/04: | Office visit. To start physical therapy with David Hochman of same practice. |

Connecticut Open MRI, 1315 Washington Blvd, Stamford CT 06902

| | |
|---|---|
| 9/13/02: | MRI |
| 5/22/03: | CT cervical spine |
| 2/26/04: | Post-op MRI |

Abraham Mintz, M.D., Neurological Surgery, 340 Capitol Avenue, Bridgeport, CT 06606

| | |
|---|---|
| 9/19/02: | Referral for evaluation of neck pain. |
| 10/8/02: | Anterocervical diskectomy with fusion performed at St. Vincent's Medical Center, 2800 Main Street, Bridgeport, CT. |
| 11/06/02: | Follow-up Office visit. |
| 12/10/02: | Office visit |
| 2/23/04: | Evaluation for second surgery |
| 3/2/04: | Posterior lumbar fusion at St. Vincent's Medical Center, 2800 Main Street, Bridgeport, CT. |

3/29/04:              Follow-up after 2nd surgery

Dr. Pagliero, Chiropractor, The Orthopaedic & Sports Medicine Center, 888 White Plains Road, Trumbull CT 06611

12/11/02:            Office visit
12/17/02:            Office visit
12/19/02:            Office visit
12/27/02:            Office visit
12/31/02:            Office visit
1/14/03:             Office visit
1/17/03:             Office visit
1/21/03:             Office visit
1/23/03:             Office visit
1/28/03:             Office visit
1/30/03:             Office visit
2/04/03:             Office visit

Isaac Cohen, M.D., The Orthopaedic & Sports Medicine Center, 888 White Plains Road, Trumbull CT 06611

6/05/03:             Evaluation for therapeutic cervical facet joint injections, given no response to oral medication, activity modification and therapy.
6/17/03:             Bilateral intraarticular C5-6 and C6-7 facet joint injections.

Jonas V. Lieponis, M.D., Murphy & Lieponis, P.C., Orthopaedic Surgery, 47 Clapboard Hill Rd., Suite 4, Guilford, CT 06437

8/14/03:             Independent Medical Examination.

                     Patient has pseudoarthrosis of cervical spine and will require surgical treatment, to include posterior spine fusion between C5-6 and C6-7. Has not reached maximum medical improvement. Recommend postponing rating until obtained MMI.

David Hochman, The Orthopaedic & Sports Medicine Center, 888 White Plains Road, Trumbull CT 06611

June 2004 - Present:  Therapy

Please see attached medical bills. I reserve the right to supplement this response in accordance with Rule 26 of the Federal Rules of Civil Procedure.

**10.    If you have had any vocational, rehabilitation, psychological, substance abuse, pain management or physical therapy tests, evaluations, examinations, studies or procedures**

since the incident, please state the nature thereof, the name, address, occupation and specialty of the individual or providing agency performing these studies, evaluations, examinations, tests ort procedures and to whom the bills were submitted.

> ANSWER: I had one treatment for pain management with Dr. Cohen of The Orthopedic & Sports Medicine Center consisting of two cortisone injections, on June 17, 2003. I have also treated with Michele Pagliero of Orthopedic & Sports Medicine Center for physical therapy and David Hochman of Orthopedic & Sports Medicine Center for physical therapy.

**11.    If you are still under the care of any provider, including those providers previously, please state the name and address of each practitioner and the nature of each condition for which care is being rendered.**

> ANSWER: Gerard Girasole, M.D. and David Hochman, D.C., The Orthopedic & Sports Medicine Center, 888 White Plains Road, Trumbull CT 06611; and Abraham Mintz, M.D., Neurological Surgery, 340 Capitol Avenue, Bridgeport, CT 06606.

**12.    Please state the name and address of each medical provider who examined or treated you for any mental or physical condition during the ten (10) year period immediately before the date of the incident and describe the conditions or complaints for which the examiner or treatment was performed and the date of each examination or treatment performed.**

> ANSWER:
>
> Bruce Famiglietti, M.D., primary care physician; he is no longer practicing medicine;
>
> Elliott Kaminitz, D.D.S., general dentistry; 5 Benefit Street, Providence, RI;
>
> Elie Cohen, M.D., 136 Rhode Island Avenue, Newport, RI for neck pain management on 2/22/94, 9/25/95, 10/5/95, 10/10/95, 10/17/95, 11/8/95, 12/8/95, 9/8/96;
>
> Vanderbilt Rehabilitation Center, 20 Powell Avenue, Newport, RI for physical therapy, ultrasound therapeutic exercise and soft-tissue manipulation on 4/16/96;
>
> Edwin Garvin Fischer M.D., 110 Francis St, Suite 3B, Boston, MA for neurological evaluation on 5/19/97;
>
> The Orthopedic & Sports Medicine Center, 888 White Plains Road, Trumbull CT, on 7/14/00, 7/18/00 and 7/27/00 for fracture of third toe.

**13.    If you claim disability, disfigurement or other residual condition from the incident, please describe the nature, extent and duration of the disability, disfigurement or other residual condition caused by your injury.**

ANSWER: I am in chronic pain and I am unable to work aboard vessels. I endured two surgeries and the recovery period for each. I have only been able to work part-time for the past two years, and work no more than 30 hours per week. I have two scars from my second surgery, one is six inches on the back of my neck and the other is four inches on my left lower back. My disability and residual condition is still being evaluated and treated.

**14.    If you claim you will sustain any monetary loss or any other expenses or damages as a result of the injuries or disability described in the previous answer, please state the reason why the loss will be incurred, the amount of the loss and the method by which you arrived at the amount of the loss.**

ANSWER: I am not able to work full time and I will never be employed at sea again. My background is in catering, restaurant management, hospitality and yachting. In order to do something else full time that will not require physical labor, I will have to go back to school. I have no way of computing the loss to be incurred by me not working full-time in my field. I reserve the right to supplement my answer to any part of this interrogatory in accordance with Rule 26 of the Federal Rules of Civil Procedure.

**15.    List each job or position of employment, including self-employment, held by you for the five years before the incident, the year in which the incident occurred and each subsequent year to the present, stating the name and address of your employer and the date of commencement, date of termination of employment and earnings for each year employed.**

ANSWER: My employment history is as follows:

9/1992 – 9/1999: General Manager of Thames Street International Yacht and Athletic Club; Thames Street, Newport, RI; $400/week plus tips.

11/1999 – 9/2000: Stewardess and Executive Chef of *Voyager*; Glidewell Laboratories; $32,000 - $35,000.

9/2000 – 12/2001: Executive Chef and Yacht Manager of *Sovereign*; Glidewell Laboratories; $42,000 - $52,000.

For three weeks following my termination from *Sovereign*, I was the Executive Chef on the *Mercedes*; Goldwing Corporation. I was hired at $67,000. I could not continue employment due to my injuries incurred on *Sovereign*.

3/2002 – 6/2004: Bar Manager at The Mansion Clamhouse; 540 Riverside Avenue, Westport, CT. I earned $10/hr. plus tips. I started at 40 hours per week and had to cut down to 20 hours per week. From October 2004 to June 2004 I worked one shift, approximately 9 hours per week.

6/2002 – 9/2002:  Office Manager at Bob Saxon & Associates in Newport, providing support for charter fleet; $13/hr.

10/2003 – 8/2004: Restaurant Manager for Centro Restaurant, 328 Pemberwick Road, Greenwich, CT 06831.  I was paid by the shift earning $130 a shift on Tuesdays, Wednesdays and Thursdays, and $150 a shift on Saturdays and Sundays.  I also received full benefits at approximately $286 per month.  After my surgery in March 2004, I only worked on Tuesdays, Wednesdays and Saturdays.  I eventually picked up a bartending shift on Thursday nights.  The restaurant also started taking $60 a month out of my paycheck to put towards my benefits as I was considered part-time.

8/2004 – Present:  Assistant Restaurant Manager for Onyx Bar & Grille, 970 High Ridge Road, Stamford, CT.  My salary is $550/week, plus tips when I pick up bartending shifts.

**16.    If you claim to have lost any time from gainful employment as a result of the incident set forth in your complaint, please state the specific condition which you claim caused the loss of time, the amount of time lost and if you claim any damage as a result of the time lost, the total of such damages claimed and your method of computing such damages.**

ANSWER:  I lost time from gainful employment after the incident in question in January 2001.  I could not physically do my job because of the pain I experienced.  After both surgeries, I could not work for a period of six weeks in order to recover.  At this time, I still cannot work full time.  In further response, please see my answer to Interrogatory Nos. 8 and 13.  I reserve the right to supplement my answer to any part of this interrogatory in accordance with the Federal Rules of Civil Procedure.

**17.    If you claim that your earning capacity will be impaired in the future as a result of your injury, please state the nature of the condition that will cause the impairment and the manner in which the condition will impair your ability to work.**

ANSWER:  Because of the injury and impairment to my neck, I cannot work full time in the field in which I am trained.  I will never be able to work on yachts again.  In further response, please see my answer to Interrogatory Nos. 8 and 13.

**18.    Please identify by name and present or last known address, those persons whom you believe were witnesses to the incident and/or to the condition which you allege caused your injury, including those persons who were present at the place where the incident occurred either shortly before or shortly after the incident, and specify which will be called to testify at trial and the anticipated testimony of each.**

ANSWER:  Those persons present and witness to the incident are the following:

Stephen Quentel:  Newport, RI
Drew – I do not know his last name or his current whereabouts.
Patsy Smith:   I believe she is now somewhere in Europe.
Dawn Ward:  I do not have a current address.
Danny Cole:  He is running the vessel, *Irony*, based out of Annapolis, MD

In addition, my friends David & Stacy Linebough, know of the incident.   David Linebough hired me as Executive Chef on *Mercedes* immediately following my termination from employment on *Sovereign*.  The Lineboughs currently reside in Alaska. My attorneys advise me that no decision has been made on who our trial witnesses will be.  I reserve the right to supplement my answer to any part of this interrogatory in accordance with the Federal Rules of Civil Procedure.

**19.    Regarding each expert witness whom you expect to testify at trial, please state the full name and address of all such e4xpert witnesses, the subject matter on which each such expert may be expected to testify, the substance of all facts to which any such expert is expected to testify, the contents of all opinions to which each expert is expected to testify and a summary of the grounds for each opinion to which each such expert is expected to testify.**

ANSWER:  Anthony H. Edwards; A.H. Edwards Marine, P.O. Box 1120, Block Island, RI 02807.  Mr. Edwards is expected to testify about the handling of the *Sovereign*, and its tender, during the time period in question and the location of the tender at the time of the incident.  At this time, Mr. Edwards' opinions have not been finalized.  I reserve the right to supplement this interrogatory in accordance with the Federal Rules of Civil Procedure and the Pretrial Order in this case.

**20.    Please fully identify all exhibits and chalks you intend to utilize at the trial to this matter.**

ANSWER:  My attorneys advise me that no decision has been made on what our trial exhibits will be.  I reserve the right to supplement my answer to this interrogatory in accordance with the Federal Rules of Civil Procedure and the Pretrial Order in this case.

**21.    If since the incident you have suffered any injuries or have been involved in any incident where you suffered injuries, please state the date, time and place of the incident; the manner in which the incident happened and; the names and addresses of all other persons involved in the incident.**

ANSWER:  None.

**22.    If you have ever asserted a claim for damages or for compensation of personal injuries, please state the date of injury, the nature of the injury, the amount of damages or**

compensation received and the name and address of each person or organization against whom a claim was made or from whom payments were received.

    ANSWER:  None.

**23.    Please list each any every witness that you or your attorneys will call to testify at the trial of this matter, including name, last known address, telephone number and expected testimony.**

    ANSWER:  Susan Myers; 426 Courtland Avenue, Unit #2, Stamford, CT 06906 and Anthony Edwards; A.H. Edwards Marine, P.O. Box 1120, Block Island, RI 02807.  My attorneys advise me that a final decision has not been made on who our other trial witnesses will be. See answers 7, 18 and 19 for witnesses who may be called to testify. I reserve the right to supplement my answer to any part of this interrogatory in accordance with the Federal Rules of Civil Procedure and the Pretrial Order in this case.

            SUSAN MYERS

STATE OF RHODE ISLAND
PROVIDENCE, SC.

    Subscribed and sworn to before me this _2 3 rd_ day of August, 2004.

            Notary Public  G. Mu
            My commission expires :  7/29/04 .

    Signed pursuant to 26(f):

            Kelly N. Michels, Esq.      Bar #6478
            Hanson Curran LLP
            146 Westminster Street
            Providence, RI 02903
            Tel:  (401) 421-2154
            Fax:  (401) 521-7040

## PROOF OF SERVICE

I hereby certify that on this **23rd** day of August, 2004 I mailed or hand delivered a copy of the above to **Seth S. Holbrook, Esq. and Robert Murphy, Esq.**, HOLBROOK & MURPHY, 150 Federal Street, 12th Floor, Boston, MA  02110.

of Hanson Curran LLP